IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | |
|---|---|
| CAROLYN MCAULIFFE, Personal Representative of the Estate of Patrick W. Frad, <br><br>        Plaintiff,<br><br>    v.<br><br>RICHARDSON COUNTY, NEBRASKA a Political Subdivision of the State of Nebraska, KEITH HAYES, Individually and as Richardson County Sheriff; JON LARSEN, Individually; JUDITH NOAH, Individually; BETTY GOLDSBERRY, Individually; DEB FRITZ, Individually; TERRI SAWYER, Individually; and LENORA LARSON, Individually,<br><br>        Defendants. | 8:04CV289<br><br>MEMORANDUM AND ORDER |

This matter is before the Court pursuant to the defendants' motion for summary judgment (Filing No. 50). Having reviewed the motion, the parties' briefs and evidentiary submissions, and the applicable law, the Court concluded to grant the defendants' motion in part and deny it in part and so advised counsel for the parties on Friday, June 10, 2005. The Court now sets forth its reasons.

**BACKGROUND**

The plaintiff in this matter is Carolyn McAuliffe ("McAuliffe"), personal representative of the estate of Patrick W. Frad ("Frad"). McAuliffe is Frad's mother and was appointed

as the personal representative of his estate on January 13, 2003. Defendant, County of Richardson ("the County"), is a political subdivision of the State of Nebraska that operates and maintains the Richardson County Jail in Falls City, Nebraska.  Defendant, Keith Hayes ("Hayes"), is the Richardson County Sheriff, and is sued in his individual and official capacities.  Defendants Judith Noah ("Noah"), Betty Goldsberry ("Goldsberry"), Deb Fritz ("Fritz"), Terri Sawyer ("Sawyer"), and Lenora Larson ("Larson") were, at all relevant times, employed as jailers/dispatchers for the Richardson County Sheriff's Department, and are sued in their individual capacities.

On February 8, 2002, defendant Jon Larsen ("Larsen"), a deputy sheriff for Richardson County, arrested Frad on a felony warrant issued from Kansas, and Frad was incarcerated at the Richardson County Jail.  Later that evening, Frad telephoned his girlfriend, Kim Bowman ("Bowman"), at the home of Christina Rowland ("Rowland"), a friend and neighbor of McAuliffe. According to Bowman, Frad made statements that he might end his life.  Following Bowman's conversation with Frad, Rowland claims that Bowman was "shook up," screaming, crying, and telling her that Frad was going to kill himself.  When Rowland visited McAuliffe's house later that evening, she told McAuliffe that she thought Frad was "unstable," and that she planned to call the jail to report Frad's instability.  Rowland urged McAuliffe to do

the same.  McAuliffe testified that, sometime that evening, she called the Sheriff's office of Richardson County and spoke to a female, who reported that Frad was fine.  Rowland also claims that she called the jail sometime that evening, and was told that the jail officials would "keep an eye on him."  Nonetheless, on February 12, 2002, Frad was discovered hanging from his upper cell bars in a noose fashioned from a bed sheet.  The evidence presented prior to trial suggests that Michael Kennedy, Frad's friend and cellmate, had choked Frad into unconsciousness and assisted in his suicide, pursuant to the plan a fellow inmate had overheard the two discussing.

On June 24, 2004, McAuliffe filed a complaint against the defendants, alleging violations of Frad's constitutional rights and wrongful death.  The defendants subsequently filed a motion to dismiss, which was denied by the Court.  The defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Summary judgment will not lie if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A fact is material only when its resolution affects the outcome of the case. *Anderson,* 477 U.S. at 248. A material issue is genuine if it has any real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). On a motion for summary judgment, the Court must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 250. However, the nonmoving party may not rest on the mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex,* 477 U.S. at 324.

**DELIBERATE INDIFFERENCE**

McAuliffe's first cause of action arises under 42 U.S.C. § 1983, and alleges that the defendants violated Frad's Eighth and Fourteenth Amendment rights because they knew of and disregarded an excessive risk to Frad's health and safety. The Eighth Amendment to the United States Constitution protects against cruel and unusual punishment. The Amendment prohibits prison officials from, *inter alia*, "acting with deliberate

indifference towards an inmate's substantial suicide risk." *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003). Moreover, "the *Fourteenth Amendment* extends at least as much protection to pre-trial detainees" like Frad. *Id.*, citing *Hott v. Hennepin County*, 260 F.3d 901, 905 (8th Cir. 2001). "A prison official may be held liable under the *Eighth Amendment* for deliberate indifference only if he or she (1) knows that the inmate faces 'a substantial risk of serious harm' and (2) 'fails to take reasonable measures' to abate that risk." *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003), citing *Farmer v. Brennan*, 511 U.S. 825, 847, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994).

To satisfy the first element, McAuliffe must show actual knowledge. "It is not enough to show the risk was obvious. A prison official is not liable under the *Fourteenth Amendment* unless the official knows of facts evidencing a substantial suicide risk *and* the official actually infers the prisoner presents a substantial suicide risk." *Coleman*, 349 F.3d at 538. Regarding the second element, the Eighth Circuit has stated, "When determining the adequacy of an official's response to a known risk of inmate safety, 'deliberate indifference includes something more than negligence but less than actual intent to harm'; it requires proof of a reckless disregard of the known risk." *Id.* at 538-39, citing *Riley v. Olk-Long*, 282 F.3d 592, 597 (8th Cir. 2002).

-5-

**1. Individual Liability of Larsen, Sawyer, Goldsberry, Larson, Fritz, Noah, and Hayes.**

The individual defendants argue that they are entitled to summary judgment on the basis of qualified immunity, because they did not subjectively know that Frad was a serious suicide risk. "A government official is shielded by qualified immunity from suit for damages if a reasonable official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official." *Olson*, 339 F.3d at 735. Moreover, "[t]o prevail against the individual county officials, the estate must establish a violation of a clearly established constitutional right, and that no genuine issues of material fact exist as to whether a reasonable official knew her actions amounted to a constitutional violation." *Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir. 2000). "When qualified immunity is claimed, it is the estate's burden to show that a material fact or question of law precludes summary judgment." *Id.* In the present case, Frad had a constitutional right to be protected from the risk of suicide. Thus, the question is whether the defendants knew of and were deliberately indifferent to that risk.

**(a) Qualified Immunity as to defendant Larsen**

Larsen was the deputy sheriff who arrested Frad on February 8, 2002. Bowman claims that Frad told her at the time of his arrest, in the presence of Larsen, that he wished he would

-6-

have shot himself before going to jail.  Bowman further claims that Larsen told Frad to be quiet before taking him into the building for booking.  Larsen, however, has no recollection of arresting Frad, or of Frad's alleged statement to Bowman.  The defendants argue that, even assuming Frad made the comment that he wished he had shot himself before going to jail, Larsen acted reasonably within his experience as a law enforcement officer by ignoring Frad's comment and/or telling him to be quiet.  The Court agrees.

In *Bell v. Stigers*, 937 F.2d 1340 (8th Cir. 1991), Stigers was the officer who booked Bell after he was arrested for drunk driving.  During the booking procedure, Stigers asked Bell whether he had been in jail before, and Bell responded, "Nope, first time, first time for everything.  Well I think I'll shoot myself."  937 F.2d at 1341.  Stigers responded, "Well sorry we don't have a gun handy."  Bell replied, "Too bad," and Stigers said, "So you're going to have to live through it like everybody else does."  *Id.*  When Bell was later found hanging by his belt from the bars of his cell door, his parents brought an action under § 1983 against the County and five of its employees, claiming that the defendants were deliberately indifferent to their son's medical and safety needs in violation of the Eighth and Fourteenth Amendments.  The district court denied summary judgment as to Stigers, holding that there was "a genuine issue

of material fact regarding whether [Bell] made a serious suicide threat which should have alerted defendant Stigers to [Bell's] suicide risk potential." *Id.* at 1342. The Eighth Circuit reversed, stating that "[a]bsent knowledge of a detainee's suicidal tendencies, the cases have consistently held that failure to prevent suicide [does not] constitute deliberate indifference." 937 F.2d at 1344, citing *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990). The Court found that "[a] single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat. Bell's remark simply does not rise to a display of suicidal tendencies." 937 F.2d at 1344.

The same is true in this case. Even if the Court assumes that Frad told Larsen that he wished he would have shot himself before going to jail, this single remark, without any other indication of suicidal tendencies, could not have reasonably been construed by Larsen as a serious suicide threat. Thus, the Court will grant summary judgment in favor of Larsen.

**(b) Qualified Immunity as to defendant Sawyer**

Sawyer is the jailer/dispatcher who booked Frad after he was arrested and completed his required intake screening. According to Sawyer, Frad commented during the booking procedure that he was depressed about being taken into custody, but he explicitly stated that he was not experiencing suicidal thoughts.

Based on this encounter alone, the Court finds that no reasonable jury could conclude that Sawyer was deliberately indifferent to Frad's needs.

In addition, Sawyer testified that she took a phone call from a female caller who asked about Frad, although she does not recall whether the call came during her shift on February 8, 2002, or the previous December when Frad was detained at the facility. Viewing the evidence in the light most favorable to McAuliffe, the Court will assume that Sawyer received a call about Frad during her shift on February 8, 2002, just days before his death.

In *Gregoire v. Class*, 236 F.3d 413 (8th Cir. 2000), Bouska was incarcerated at the South Dakota State Penitentiary when he committed suicide. Prior to his suicide, Bouska had placed a call to his ex-wife, telling her that he was going to kill himself. She immediately called the prison and alerted Joffer, a case manager in Bouska's cell block. Unbeknownst to Joffer, Bouska had a prior history of depression and suicide attempts. Joffer pulled Bouska's file, wrote a short report about the phone call, and dealt with a few other prisoners before trying to locate Bouska. Nearly an hour after the phone call, Joffer paged Bouska to come to his office. A few minutes later, Bouska's cellmate found that Bouska had hung himself. The Court held that Joffer was entitled to qualified immunity, stating,

"Had Joffer known of Bouska's previous history of suicidal ideation, and the fact that he had been on suicide watch for a few days, a quicker attempt to locate Bouska may have been warranted.  However, since the only indication of risk was one phone call from [his ex-wife] saying Bouska was going to kill himself . . . we cannot characterize Joffer's subsequent actions as deliberately indifferent.  They are at most negligent."  236 F.3d at 419.

Similarly, in this case, Sawyer remembers the caller asking if Frad was alright.  She reported to the caller that Frad was in her sight at the time and that he was fine.  She further testified that if she had felt Frad was suicidal at the time, she would have made a notation in the phone log and taken precautionary steps.  However, because she did not believe that Frad was a suicide risk at the time, she made no such notation in the phone log.  In fact, there is no evidence that Sawyer had any indication, other than a single phone call, that Frad was a suicide risk.  As the Court held in *Gregoire*, "Our cases indicate that a single phone call to an official who has no other reason to think an inmate is a suicide risk, most likely does not create a strong likelihood that infliction of self-harm will result."  236 F.3d at 418.  As a result, the Court finds that Sawyer's actions cannot reasonably be classified as deliberate indifference.

Sawyer had additional encounters with Frad during her shift on February 8, 2002.  That evening, Frad told Sawyer he wanted to talk, and asked Sawyer to recommend a minister.  Sawyer called Pastor Ray Weinerman ("the Pastor"), but before the Pastor arrived, Sawyer was alerted that Frad had passed out in his cell. Within three minutes, Sawyer summoned Officer Steve Goldsberry to take Frad out of his cell and into the lower level of the jail for closer observation.  Sawyer noted in the jail log that Frad's vital signs were normal, but he was somewhat shaky.  When Frad calmed down, he stated that he thought he had an anxiety attack. Frad was kept on the lower level of the jail, away from the general population, until the Pastor arrived.  Sawyer testified that after Frad spoke with the Pastor, he seemed relaxed and visibly better.  After Frad was returned to the general population, Sawyer went off duty and had no further contact with Frad before his death.

McAuliffe claims that Frad's request to see someone to talk about his problems, and his subsequent anxiety attack, were indications that Frad had a serious mental health condition and was in need of treatment.  However, the Court finds that Frad's request to see a minister, and his apparent anxiety attack, were not enough to alert Sawyer that Frad was a suicide risk.  Under the standard for deliberate indifference, McAuliffe must prove that Sawyer had *actual knowledge* that Frad was a suicide risk,

-11-

and she has simply failed to do so. Thus, summary judgment will be granted as to Sawyer.

**(c) Qualified Immunity as to defendant Goldsberry**

Goldsberry began her shift on the evening of February 8, 2002, at about the time Frad finished meeting with the Pastor. According to Goldsberry, the Pastor reported that he felt Frad was fine. At about 11:45 p.m. that night, Goldsberry claims that she checked on Frad and specifically asked him whether he was having suicidal thoughts. Frad told her he was not suicidal, and Goldsberry recorded this conversation in the jail log. Goldsberry was also on the night shift on February 9, 2002, but testified that she does not recall any further contact with Frad. Based on this evidence, the Court holds that no reasonable jury could find that Goldsberry was deliberately indifferent to Frad's medical needs. There is nothing to indicate that Goldsberry had actual knowledge that Frad was a suicide risk. Thus, summary judgment will be granted as to Goldsberry.

**(d) Qualified Immunity as to defendant Larson**

Larson was on duty at the facility on February 9, 2002. At 2:50 p.m. that day, Frad's cellmate alerted Larson that Frad had passed out in his cell, and Larson found Frad exhibiting "small shakings of the feet, hands, and eyelids." Frad reported to Larson that he didn't "feel very well." Larson thought Frad might be having a seizure, so she called another officer, who

took Frad to the emergency room at the local hospital for treatment. Based on the foregoing, there is no evidence that Larson had any knowledge that Frad was a suicide risk. When she thought Frad was having a seizure, Larson immediately called for help and ensured that Frad received proper medical attention. The Court holds that a reasonable jury could not find that Larson was deliberately indifferent to Frad's medical needs. Thus, summary judgment will be granted as to Larson.

**(e) Qualified Immunity as to defendant Fritz**

Fritz was on duty from about 4:00 p.m. to 11:00 p.m. on February 11, 2002. That night, Fritz recalls another inmate mentioning to her that Frad "seemed depressed," and Fritz made a notation of that in the jail log. Fritz then went to speak with Frad and, based on her observations, determined that he was fine. She testified that she did not perceive Frad to be a suicide risk. Based on the evidence presented, the Court holds that no reasonable jury could find that Fritz was deliberately indifferent to Frad's medical needs. Summary judgment will be granted as to Fritz.

**(f) Qualified Immunity as to defendant Noah**

Noah was on duty the night of February 11, 2002. She testified that she remembers Fritz mentioning that Frad was "a little down," and worried that he would not get his seizure medication the next day. Noah claims she assured Frad that she

would do her best to get him his medicine the next day. She testified that she did not observe any signs that Frad might be considering suicide. However, at approximately 1:09 a.m. on February 12, 2002, Noah was performing the first of her hourly jail checks when she discovered Frad hanging from his upper cell bars, and immediately called for assistance. The Court finds that Noah's knowledge that Frad was "a little down" because he didn't know if he would get his seizure medication the next day is not enough to indicate that Frad was a suicide risk. Thus, summary judgment will be granted as to Noah.

**(g) Qualified Immunity as to defendant Hayes in his Individual Capacity**

Hayes is the County Sheriff, and McAuliffe claims he was responsible for the training, supervision, and conduct of the defendants. However, Hayes may be held individually liable under § 1983 only if he directly participated in the constitutional violation, or if his failure to properly supervise or train the offending employees caused the deprivation of constitutional rights. See *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). As the Court in *Andrews* further stated, "The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* (citations omitted).

-14-

The Court finds that there is no evidence in this case that Hayes was directly involved in any alleged deprivation of Frad's constitutional rights. McAuliffe has presented no evidence to suggest that Hayes knew Frad was a suicide risk. Moreover, there is also no evidence that Hayes had notice that the training procedures and supervision at the Richardson County Jail were inadequate and likely to result in a constitutional violation. There had been no successful suicide attempts at the Richardson County jail prior to Frad's. Thus, Hayes is entitled to summary judgment.

Because the individual defendants had no actual knowledge that Frad was a suicide risk, McAuliffe has failed to satisfy her burden of showing that there is a genuine issue of material fact regarding whether the defendants were deliberately indifferent to Frad's medical needs. As a result, the defendants are entitled to qualified immunity. Summary judgment will be granted in favor of defendants Larsen, Sawyer, Goldsberry, Larson, Fritz, Noah, and as to Hayes in his individual capacity.

**2. Liability of Richardson County and Hayes in his official capacity.**

McAuliffe has also brought a claim against Richardson County and Hayes in his official capacity.[1] Specifically, McAuliffe claims that the failure to properly train employees on

---

[1] The Court notes that a suit against Hayes in his official capacity is a suit against the County.

suicide identification and prevention led to a deprivation of Frad's constitutional rights. "In a section 1983 action, a municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality." *Yellow Horse*, 225 F.3d at 928. Moreover, as the Eighth Circuit has stated, "A municipality may be liable for failure to train its employees when that failure can be shown to be deliberate indifference to the rights of others." *Id.*, citing *Canton v. Harris*, 489 U.S. 378, 389, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989). In other words, in order to find the County and Hayes liable, McAuliffe must show that they "had notice that [the suicide identification and prevention] procedures were inadequate and likely to result in a violation of constitutional rights." *Andrews*, 98 F.3d at 1076.

    The defendants claim that there is no evidence that the jail employees were improperly trained in the areas of suicide identification and prevention. Rather, the defendants claim that the County provided its employees with a Policies and Procedures manual which addressed how to handle mental distress of inmates and suicide prevention. Also, the defendants claim that all of the jailers and dispatchers had completed training in monitoring suicidal inmates and preventing the suicide of inmates.

    McAuliffe, on the other hand, claims that a question of fact exists as to the depth and quality of the training that was

-16-

given to the Richardson County Jail employees. Specifically, Hayes testified that he received no training regarding identifying and dealing with inmates in jail. Goldsberry testified that she had no recollection of training in identifying and handling suicidal prisoners. Noah also testified that she has no recollection of any ongoing training dealing with suicidal prisoners. Fritz testified that she had no recollection of any training regarding suicide, and that she had never seen a periodical called the Nebraska Jail Bulletin. Deputy Steve Goldsberry, however, testified that the Nebraska Jail Bulletins are passed around to the employees, and the employees are expected to follow the recommendations contained in the bulletins.

      McAuliffe also claims that the confusion among the jail employees about how to handle inmates who expressed some level of distress indicates a lack of proper training. For instance, Hayes and Steve Goldsberry testified that if an inmate was extremely distraught, they would be entitled to an evaluation by Blue Valley Mental Health. McAuliffe argues that the defendants have also shown confusion regarding the proper way to handle a phone call from a family member indicating that an inmate is emotionally unstable. Larson testified that the inmate should be put on suicide watch. Sawyer, however, testified that she would contact the inmate, and she might remove the inmate from the

-17-

general population, depending on the assessment.  Fritz testified that the common practice was simply to speak to the inmate.  Finally, Noah testified that she would talk to jail administration to get direction on how to handle the situation.

Viewing all of this evidence in the light most favorable to McAuliffe, the Court believes that a question of fact exists regarding the adequacy of the training given to the jail employees on suicide identification and prevention.  While the defendants claim that all of the employees were trained on the prevention of suicide, McAuliffe has presented evidence that several of the defendants do not recall receiving any such training.  Accordingly, the Court believes that a factual issue remains as to whether the defendants' policies were inadequate and deliberately indifferent to the possibility of suicides.  Thus, the defendants' motion for summary judgment will be denied as to the County and Hayes in his official capacity.

## WRONGFUL DEATH

McAuliffe's second cause of action is for wrongful death, in which she claims that the County negligently breached its duty to protect Frad's health and life.  The defendants argue that the County is entitled to summary judgment because Kennedy's involvement in Frad's death was an intervening cause that was sufficient to break the causal chain between Frad's death and any alleged negligence by jail officials.  However, the Nebraska

-18-

Supreme Court has held that "[t]he question whether the negligence of a third person constitutes an intervening cause is a question of fact." *Kozicki v. Dragon*, 255 Neb. 248, 253, 583 N.W.2d 336, 340 (1998).  Thus, the Court finds that this issue is not suited for resolution at the summary judgment stage.

## CONCLUSION

The Court finds that there is no genuine issue of material fact regarding whether the individual defendants were deliberately indifferent to Frad's medical needs.  However, the Court finds that material issues of fact exist regarding whether the County's training policies on suicide identification and prevention were adequate.  Finally, the Court finds that a question of fact exists as to whether Kennedy's involvement in Frad's death was an intervening cause that broke the causal chain between Frad's death and any negligence of the County.  Accordingly,

IT IS ORDERED:

1) Summary judgment is granted in favor of defendants Larsen, Sawyer, Goldsberry, Larson, Fritz, Noah, and Hayes in his individual capacity.

2) Summary judgment is denied as to the County and Hayes in his official capacity.

3) Summary judgment is denied on McAuliffe's wrongful death claim.

DATED this 21st day of June, 2005.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court