IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CAROLYN MCAULIFFE, Personal Representative of the Estate of Patrick W. Frad, | ) ) ) ) | |
| Plaintiff, | ) ) | 8:04CV289 |
| v. | ) ) | |
| RICHARDSON COUNTY, NEBRASKA a Political Subdivision of the State of Nebraska, KEITH HAYES, Individually and as Richardson County Sheriff; JON LARSEN, Individually; JUDITH NOAH, Individually; BETTY GOLDSBERRY, Individually; DEB FRITZ, Individually; TERRI SAWYER, Individually; and LENORA LARSON, Individually, | ) ) ) ) ) ) ) ) ) ) ) ) | MEMORANDUM OPINION |
| Defendants. | ) ) | |

This matter came before the Court for trial on June 13, 2005. At the close of the plaintiff's evidence on June 15, 2005, the defendants made an oral motion for directed verdict. For the reasons stated in the record, the Court granted the defendants' motion for directed verdict as to the plaintiff's § 1983 claim and denied the motion as to the plaintiff's wrongful death claim. The jury was then discharged.[1] The defendants rested, both sides

---

[1] McAuliffe's wrongful death claim falls under the Nebraska Political Subdivisions Tort Claims Act, which declares that no suit shall be maintained against a political subdivision of the State of Nebraska except to the extent provided in the Act. See Neb. Rev. Stat. § 13-902. Actions brought under the Act must be tried to the court without a jury. See Neb. Rev. Stat. § 13-907.

waived closing argument, and the Court took the plaintiff's wrongful death claim under advisement. The Court has reviewed the evidence and the briefs of the parties and now makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**BACKGROUND**

The plaintiff in this case is Carolyn McAuliffe ("McAuliffe"), personal representative of the estate of Patrick W. Frad ("Frad"). McAuliffe is Frad's mother, and was appointed as the personal representative of his estate on January 13, 2003. Defendant, County of Richardson ("the County"), is a political subdivision of the State of Nebraska that operates and maintains the Richardson County Jail in Falls City, Nebraska. Defendant, Keith Hayes ("Hayes"), is the Richardson County Sheriff and is sued in his individual and official capacities. Defendants Judith Noah ("Noah"), Betty Goldsberry ("Goldsberry"), Deb Fritz ("Fritz"), Terri Sawyer ("Sawyer"), and Lenora Larson ("Larson") were, at all relevant times, employed as jailers/dispatchers for the Richardson County Sheriff's Department and are sued in their individual capacities.

On February 8, 2002, defendant Jon Larsen ("Larsen"), a deputy sheriff for Richardson County, arrested Frad on a felony warrant issued from Kansas, and Frad was incarcerated at the Richardson County Jail. Later that evening, at approximately

5:57 p.m., Frad telephoned his girlfriend, Kim Bowman ("Bowman"), at the home of Christina Rowland ("Rowland"), a friend and neighbor of McAuliffe. They spoke for approximately 14 minutes. According to Bowman, Frad was scared, did not want to go to jail, and stated that he might end his life. Following Bowman's conversation with Frad, Rowland claims that Bowman was screaming, crying, and saying that Frad was going to kill himself. It is undisputed, however, that Bowman never called the jail to report her concerns. When Rowland visited McAuliffe's house later that evening, she told McAuliffe that she planned to call the jail to report Frad's instability and urged McAuliffe to do the same. McAuliffe testified that, sometime that evening, she called the Sheriff's office of Richardson County and asked them to watch Frad. The woman who answered reported that Frad was in her sight, and he was doing fine. Rowland also claims that she called the jail some time that evening and asked them to keep an eye on Frad. The person who answered thanked Rowland for her call and said that the jail officials would take care of it.[2]

Nonetheless, on February 12, 2002, Frad was discovered hanging from his upper cell bars in a noose fashioned from a bed sheet. An investigation by J.L. Rogers of the Nebraska State

---

[2] It is important to note that McAuliffe and Rowland never stated to jail officials that they believed Frad was "suicidal." Rather, they simply asked officials to "watch him" and "keep an eye on him."

Patrol later revealed that Frad's friend and cellmate, Michael Kennedy, whom Frad had known since they met at a local carnival in September 2001, had assisted Frad in committing suicide. According to Kennedy, Frad stood on a chair and placed the noose around his neck. Kennedy then choked Frad into unconsciousness, kicked the chair out from under him, and went to bed. A criminal complaint was subsequently filed, to which Kennedy pled guilty. (See Exhibit 119).

On June 24, 2004, McAuliffe filed a complaint against the defendants, alleging violations of Frad's constitutional rights and wrongful death. The defendants subsequently filed a motion to dismiss, which was denied by the Court. The Court later granted summary judgment in favor of the individual defendants on the plaintiff's § 1983 claim. However, the wrongful death claim and the § 1983 claim against the County and Hayes in his official capacity were allowed to proceed to trial. After reviewing the evidence presented at trial, the Court finds that the defendants, either singly or collectively, were not negligent in their handling and treatment of Frad. Thus, McAuliffe's wrongful death claim will be dismissed.

### WRONGFUL DEATH

Under Nebraska law, "a personal representative [is authorized] to bring a civil action on behalf of the surviving spouse or next of kin for damages they have sustained as a result

of the decedent's death caused by another person." *Reiser v. Coburn*, 255 Neb. 655, 659, 587 N.W.2d 336, 339 (1998).  See also Neb. Rev. Stat. §§ 30-809 and 30-810.  In this case, McAuliffe seeks to recover damages for the wrongful death of Frad, which she claims was caused by the negligence of the defendants.  Because McAuliffe's action for wrongful death sounds in negligence, she must prove the usual elements of negligence: "[A] legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from such undischarged duty."  *Tiede v. Loup Power Dist.*, 226 Neb. 295, 299, 411 N.W.2d 312, 316 (1987), citing *Holden v. Urban*, 224 Neb. 472, 474, 398 N.W.2d 699, 701 (1987).

First, McAuliffe must prove that the defendants had a duty to protect Frad from injury.  McAuliffe claims that the defendants had a duty to exercise reasonable care to protect Frad's health and life, including the prevention of self-inflicted harm.  "Courts generally have recognized a duty to take reasonable action to protect prisoners even from self-inflicted injury or suicide."  *Hille v. Wright County*, 400 N.W.2d 744 (Minn. App. 1987), citing Jane M. Draper, Annotation, *Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoners*, 79 A.L.R.3d 1210 (1977).  It is clear that

-5-

the defendants had a duty to exercise reasonable care to protect Frad from self-inflicted injury.

Nonetheless, it is not enough for McAuliffe to show that the defendants had a duty to protect Frad from self-inflicted injury. McAuliffe must also prove that the defendants *breached* that duty. McAuliffe claims that the defendants breached their duty because they knew or should have known that Frad would inflict harm upon himself, but they failed or refused to place Frad under "suicide watch" or take other action to protect him. After a thorough review of the record, however, the Court has found no evidence that would have led a reasonable person in the position of the defendants to conclude that Frad was a suicide risk.

The first defendant to come into contact with Frad was Larsen, the deputy sheriff who arrested Frad on February 8, 2002. Bowman claims that Frad told her at the time of his arrest, in the presence of Larsen, that he wished he would have shot himself before going to jail. Bowman further claims that Larsen told Frad to be quiet before taking him into the building for booking. Larsen, however, has no recollection of arresting Frad, or of Frad's alleged statement to Bowman. The Court finds that, even assuming Frad made the comment that he wished he had shot himself before going to jail, Larsen acted reasonably within his experience as a law enforcement officer.

In *Bell v. Stigers*, 937 F.2d 1340 (8th Cir. 1991), Stigers was the officer who booked Bell after he was arrested for drunk driving. During the booking procedure, Stigers asked Bell whether he had been in jail before, and Bell responded, "Nope, first time, first time for everything. Well I think I'll shoot myself." 937 F.2d at 1341. Stigers responded, "Well sorry we don't have a gun handy." Bell replied, "Too bad," and Stigers said, "So you're going to have to live through it like everybody else does." *Id.* When Bell was later found hanging by his belt from the bars of his cell door, his parents brought an action against the County and five of its employees. The Eighth Circuit found that "[a] single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat." 937 F.2d at 1344. The same is true in this case. Even if the Court assumes that Frad told Larsen that he wished he would have shot himself before going to jail, this off-hand remark is not sufficient to put a reasonable person in Larsen's position on notice that Frad was a suicide risk.

The next defendant to come into contact with Frad was Sawyer, the jailer/dispatcher who booked Frad and completed his required intake screening after he was arrested. As required by the booking form, Sawyer asked Frad if he felt depressed or suicidal. Frad stated that he was depressed about being taken into custody, but he explicitly stated that he was not

experiencing suicidal thoughts. (See Exhibit 7 of Exhibit 118). Sawyer testified that there was nothing about Frad's responses or demeanor that suggested to her that he was unstable. Following the booking procedure, at approximately 4:50 p.m., Frad was secured into the general population and, upon his request, was placed in a cell with his friend, Michael Kennedy.

Sawyer also testified that she took a phone call from a female caller who asked how Frad was doing, and she responded that he was in front of her and doing fine. Sawyer does not recall whether this call came during her shift on February 8, 2002, or the previous December when Frad was detained at the facility.[3] However, even if Sawyer did receive the call during her shift on February 8, 2002, the Eighth Circuit has held that "a single phone call to an official who has no other reason to think an inmate is a suicide risk, most likely does not create a strong likelihood that infliction of self-harm will result." *Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000). The caller never stated that Frad was suicidal or a danger to himself. Sawyer testified that if she had received a call from someone who reported that an inmate was suicidal, she would have recorded the call in the jail log. The jail log does not contain any evidence

---

[3] Frad, Kennedy, and a third party had been arrested in December 2001 and charged with manufacturing of methamphetamine. Frad was released on bond in early January 2002, while Kennedy remained in jail.

of such a call on February 8, 2002.  (See Exhibit 5 of Exhibit 118).

On the evening of February 8, 2002, when Sawyer performed a jail check, Frad met Sawyer at the gate and told her he wanted to talk.  Frad asked Sawyer to recommend a minister, so she called Pastor Ray Weinerman ("Weinerman").  Before Weinerman arrived, at approximately 9:05 p.m., Sawyer was alerted that Frad had passed out in his cell.  Sawyer summoned her supervisor, Officer Steve Goldsberry, who took Frad out of his cell and into the lower level of the jail for closer observation.  Sawyer noted in the jail log that Frad's vital signs were normal, but he was somewhat shaky.  (See Exhibit 5 of Exhibit 118).  When Frad calmed down, he stated that he thought he had an anxiety attack.  Frad was kept on the lower level of the jail, away from the general population, until Weinerman arrived.

Weinerman spent two hours with Frad, from approximately 9:27 p.m. to 11:27 p.m.  Weinerman testified that Frad was distraught, upset, and concerned about drug charges in Kansas.  However, Frad did not mention suicide and actually felt it was important for him to live.  Weinerman felt he related well with Frad, and he was satisfied that Frad was not a risk to himself or others.  Sawyer testified that after Frad spoke with Weinerman, he seemed relaxed and visibly better.  After Frad was returned to the general population, Sawyer went off duty and does not recall

any further contact with Frad before his death.  The Court finds that Sawyer was not negligent in her handling of Frad and further finds that a person in Sawyer's position would not have construed Frad's request to see a minister, or his apparent anxiety attack, as an indication that he was a suicide risk.

After Frad was returned to the general population, the next defendant to come into contact with Frad was Betty Goldsberry.  Goldsberry began her shift on the evening of February 8, 2002, at about the time Frad finished meeting with Weinerman.  According to Goldsberry, Weinerman reported that he felt Frad was fine.  At about 11:45 p.m. that night, Goldsberry claims that she checked on Frad and specifically asked him whether he was having suicidal thoughts.  Frad told her he was not suicidal, and Goldsberry recorded this conversation in the jail log.  (See Exhibit 5 of Exhibit 118).  Goldsberry was also on the night shift on February 9, 2002, but testified that she does not recall any further contact with Frad.  The Court finds that Goldsburry was not negligent in her contacts and handling of Frad and further finds that no reasonable person in Goldsberry's position would have suspected that Frad was a suicide risk.

Larson was the next defendant who had contact with Frad.  Larson was on duty at the facility on February 9, 2002.  At 2:50 p.m. that day, Frad's cellmate alerted Larson that Frad had passed out in his cell, and Larson found Frad exhibiting

-10-

small shakings of the feet, hands, and eyelids. Frad reported to Larson that he didn't feel very well. Larson thought Frad might be having a seizure, so she called another officer, who took Frad to the emergency room of the local hospital for treatment.[4] Based on these facts, there is no evidence to suggest that Larson was negligent or knew or should have known that Frad was a suicide risk. When she thought Frad was having a seizure, she acted reasonably by calling for help and ensuring that Frad received proper medical attention.

The next defendant to testify was Fritz who came into contact with Frad during her duty tour from about 4:00 p.m. to 11:00 p.m. on February 11, 2002. That night, Fritz recalls another inmate mentioning to her that Frad "seemed depressed," and Fritz made a notation of that in the jail log. (See Exhibit 5 of Exhibit 118). Fritz then went to speak with Frad and, based on her observations, determined that Frad was fine. She testified that she did not perceive Frad to be a suicide risk. The Court believes that, based on her observations, it was reasonable for Fritz to conclude that Frad was not a suicide risk and further finds that she was not negligent in her handling of Frad. It is not uncommon for inmates to be depressed, and Fritz

---

[4] Frad was admitted to the emergency room at approximately 3:35 p.m. Medical records indicate that Frad had a possible seizure, though the cause was unknown. (See Exhibit 10 of Exhibit 118). He was prescribed seizure medication and released from the emergency room at approximately 4:55 p.m. the same day.

acted reasonably by going to check on Frad after she was told that Frad seemed depressed.

The final jailer/dispatcher in contact with Frad was Noah, who was on duty the night of February 11, 2002. Noah testified that she remembers Fritz mentioning that Frad was "a little down" and worried that he would not get his seizure medication the next day. Noah spoke to Frad at approximately 11:47 p.m., at which time she assured Frad that she would do her best to get him his medicine the next day. She testified that she did not observe any signs that Frad might be considering suicide. In fact, she testified that Frad was reading and seemed cheerful. However, at approximately 1:09 a.m. on February 12, 2002, Noah was performing the first of her hourly jail checks when she discovered Frad hanging from his upper cell bars, and immediately called for assistance. The Court finds that Noah's knowledge that Frad was "a little down" because he didn't know if he would get his seizure medication the next day was not enough to find that she acted negligently and further finds that no reasonable person in Noah's position would conclude that Frad was a suicide risk.

McAuliffe also claims that Hayes breached his duty to protect Frad from self-inflicted injury. Hayes has been sued in his individual and official capacities. The Court finds that Hayes cannot be liable for negligence in his individual capacity

because he had no direct involvement in the events surrounding Frad's suicide.  There is simply no evidence to suggest that Hayes knew or should have known that Frad would inflict harm upon himself.

In addition, the Court holds that McAuliffe's wrongful death claim against the County and Hayes in his official capacity is equally without merit.[5]  Essentially, McAuliffe claims that the County and Hayes were negligent because they knew or should have known that Frad would inflict harm upon himself, but they failed to take action to protect him.  Obviously, the County can only act through its employees.  Thus, the only way McAuliffe could impute such knowledge to the County and Hayes is through the doctrine of respondeat superior.  To hold the County liable for the negligence of its employees, McAuliffe would first have to prove that the individual defendants were negligent.  Because the Court has already determined that the individual defendants were not negligent in this case, it follows that the County and Hayes in his official capacity cannot be liable.

The Court has found that none of the defendants breached their duty to protect Frad from self-inflicted harm, and therefore McAuliffe's claim for wrongful death will be dismissed.  There are two remaining issues which are mooted by the Court's

---

[5] The Court notes that a suit against Hayes in his official capacity is to be treated as a suit against the County.

analysis of the negligence claims but which will be addressed for completeness purposes.

### PROXIMATE CAUSE

In addition to proving negligence, McAuliffe would also have to prove that Frad's death, and the resulting damages to his next of kin, were the direct and proximate result of the alleged acts and omissions of the defendants. The defendants deny that their actions were the proximate cause of Frad's death and also assert that Michael Kennedy's actions were an efficient intervening cause that broke the causal chain between Frad's death and any alleged negligence of the defendants. "An efficient intervening cause is a new, independent force intervening between the defendant's negligent act and the plaintiff's injury." *Stahlecker v. Ford Motor Co.*, 266 Neb. 601, 610, 667 N.W.2d 244, 254 (2003), citing *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003). "This force may be the conduct of a third person who had full control of the situation, whose conduct the defendant could not anticipate or contemplate, and whose conduct resulted directly in the plaintiff's injury." *Id.*

In this case, the Court believes that the evidence establishes that Kennedy's actions were an intervening cause in Frad's death. In addition to sharing a cell, Frad and Kennedy were friends, and the defendants had no reason to suspect that Kennedy would assist Frad in committing suicide. In fact, the

-14-

evidence shows that placing an inmate in a cell with another inmate is one of the methods used in jails for the protection of inmates. Thus, the defendants were reasonable in assuming that it would be beneficial, not harmful, to place Frad in a cell with Kennedy. The Court believes that Frad's death was clearly due in significant part to Kennedy's independent actions that constituted an efficient intervening cause of Frad's death.

## DAMAGES

There are also serious questions in this case about the damages McAuliffe claims as a result of Frad's death. McAuliffe argues that she, Bowman, Frad's sister, and Frad's children were all dependent on Frad for future support and maintenance. She claims that, as a result of Frad's death, his next of kin and heirs have been deprived of his future contributions, support, care and maintenance, along with his aid, comfort, assistance, society and companionship. The plaintiff's expert, William Kennedy, a CPA, testified that these economic losses amounted to $461,847.00. However, the only evidence regarding wages earned by Mr. Frad was one W-2 statement which the expert had reflecting total wages of $1,286.10. The evidence further reflected that Frad had made no contributions to the support of his children or their mother to whom he was not married. The evidence also establishes that he was facing a prison term in Kansas (Frad thought it would be over fifty years), and a prison sentence in

Nebraska. In view of these facts not considered by Mr. Kennedy, the Court finds that his testimony amounts to nothing more than speculation and could not be relied upon in determining what monetary losses were suffered by his heirs and next of kin.

## CONCLUSION

For the reasons stated in the record, the plaintiff's amended complaint will be dismissed. A separate order will be entered in accordance with this memorandum opinion.

DATED this 24th day of June, 2005.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court